# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

JOY J.,                                  :
                                         :
     Plaintiff,                        :
                                         :          CIVIL ACTION NO.
     v.                                :          3:21-cv-00015-RGV
                                         :
COMMISSIONER, SOCIAL                     :
SECURITY ADMINISTRATION,                 :
                                         :
     Defendant.                        :

## **<u>FINAL ORDER</u>**

This is an action to review the determination by the Commissioner of Social Security ("the Commissioner") that claimant Joy J. ("claimant") is not entitled to a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-433. For the reasons that follow, the Commissioner's decision denying claimant's application for DIB is **AFFIRMED**.[1]

---

[1] The parties have consented to have a magistrate judge conduct any and all proceedings, including the entry of final judgment. <u>See</u> [Docket entries dated 10/06/2021 & 10/08/2021].

# I. PROCEDURAL HISTORY

Claimant, who was born on March 22, 1963, obtained a high school or high school equivalent education and attended at least two years of college, and has past relevant work experience as a medical secretary, protectively filed an application for DIB on October 19, 2017,[2] alleging an onset of disability as of January 1, 2010, which was subsequently amended to January 1, 2015, due to spondylosis with radiculopathy of the cervical region, cervical disc displacement, spinal stenosis, fibromyalgia, and sacroiliitis. (Tr.[3] at 15, 37, 40-44, 61, 73-74, 94-97,

---

[2] "Protective filing is a term for the first time an individual contacts the Social Security Administration [('SSA')] to file a claim for benefits." Walker v. Astrue, Civil Action File No. 1:12–CV–2586–TWT, 2013 WL 5354213, at *2 n.1 (N.D. Ga. Sept. 24, 2013) (citation and internal marks omitted), adopted at *1. "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." Id. (citation and internal marks omitted). Additionally, the Commissioner published final rules entitled, "Revisions to Rules Regarding the Evaluation of Medical Evidence; Correction," on January 18, 2017, which became effective as of March 27, 2017. See 82 FR 15132-01, 2017 WL 1105368 (Mar. 27, 2017). "Some of the new rules apply only to applications/claims filed before March 27, 2017, and others apply only to applications/claims filed on or after March 27, 2017." Christensen v. Saul, DOCKET NO. 1:19cv68-MOC, 2019 WL 6359764, at *2 n.1 (W.D.N.C. Nov. 27, 2019) (citations omitted). Since claimant "filed her application[] after March 27, 2017, the Commissioner's revised [R]egulations apply to the evaluation of her claim[]." A.A.S. v. Comm'r of Soc. Sec., Case No: 3:20-CV-74-MSH, 2021 WL 4313603, at *3 (M.D. Ga. Sept. 22, 2021) (citations omitted).

[3] See [Doc. 11] and its attachments for the electronic Certified Administrative Record ("eCAR"), hereinafter referred to as ("Tr. at __"). With the exception of the eCAR, which is cited according to the actual transcript page number shown on the bottom right corner of the record, the cited document and page numbers in this

114, 123, 172, 180-88, 222, 232, 236-37, 245, 254-55, 283, 295, 750).   Claimant's application was denied initially and on reconsideration, (Tr. at 73-119, 122-26), and claimant then requested a hearing before an Administrative Law Judge ("ALJ"), (Tr. at 127-75).   On April 15, 2020, the ALJ, Melinda L. Dula, held the administrative hearing by telephone "due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic." (Tr. at 15, 33-72).[4]

On June 17, 2020, the ALJ issued a decision denying claimant's DIB application upon finding that claimant had not been under a "disability" as defined by the Act from January 1, 2015, through the date claimant was last insured.  (Tr. at 12-32).[5] Specifically, the ALJ found that claimant had the severe impairments of cervical degenerative disc disease, status post-surgery; cervical radiculopathy; fibromyalgia; osteoporosis; and bilateral hearing loss/tinnitus, as

---

Final Order refer to the document and page numbers shown on the Adobe file reader linked to this Court's electronic filing database (CM/ECF).

[4] Valerie Allen testified as the vocational expert ("VE") at the administrative hearing.  See (Tr. at 59-72); see also (Tr. at 316-18 (VE's resume)).

[5] "To be eligible for [DIB], a claimant must demonstrate a disability on or before the last date on which she was insured."  Castleman v. Comm'r, Soc. Sec. Admin., 824 F. App'x 927, 927 (11th Cir. 2020) (per curiam) (unpublished) (citations omitted); see also (Tr. at 15).  The ALJ determined that claimant met the insured status requirements of the Act through December 31, 2019.  (Tr. at 15, 17).

well as the non-severe impairments of depression and anxiety, but that she did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  (Tr. at 17-20 (emphasis and citations omitted)). The ALJ then found that claimant retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), except with the following limitations:

> [Claimant can] lift[]/carry[] twenty pounds occasionally and ten pounds frequently, and the claimant can stand/walk six hours and sit up to six hours in an eight-hour workday with normal breaks.  She can push/pull with the upper extremities bilaterally occasionally. She can operate foot controls with the lower extremities bilaterally and occasionally.  She can never climb ladders, ropes, or scaffolds. She can occasionally climb ramps and stairs.  She can occasionally stoop, kneel, crouch, crawl, or balance.  She can handle and finger bilaterally frequently and can reach overhead bilaterally occasionally. She should avoid concentrated exposure to extreme vibrations, such as working on a vibrating surface.  She should also avoid concentrated exposure to unprotected heights and hazardous machinery.  She is limited to jobs with no more than moderate office noise and will be off task up to ten percent daily.

(Tr. at 20 (emphasis omitted)).   The ALJ then concluded, based on the VE's testimony at the administrative hearing, that claimant was capable of performing her past relevant work as a medical secretary.  (Tr. at 26 (citation omitted)).

Claimant sought review by the Appeals Council, (Tr. at 177-79), and on December 16, 2020, the Appeals Council denied claimant's request for review, making the ALJ's decision the final decision of the Commissioner, (Tr. at 1-6).

Claimant appealed the decision to the district court seeking review of the Commissioner's decision. [Doc. 1]. Specifically, claimant argues on appeal that substantial evidence does not support the ALJ's RFC assessment because she failed to explain or provide any evidentiary support for her determination that claimant would be off task for up to 10 percent of the workday, and because she failed to properly consider the opinions offered by Daniel A. Irons, M.D. ("Dr. Irons"), following his April 3, 2018, consultative examination of claimant. [Doc. 13]; see also [Doc. 15].[6] The relevant details of claimant's medical history and the evidence in the record will be set forth as necessary during the discussion of the issues raised by claimant. Thus, the matter is now before the Court upon the administrative record and the parties' briefs, [Docs. 11, 13, 14, & 15], and is ripe for review pursuant to 42 U.S.C. § 405(g).

## II.  STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

---

[6] Claimant "did not raise other arguments," and she "thus waived all challenges to the ALJ's decision except the one[s] briefed." Jones ex rel. Martensen v. Colvin, No. CV414–130, 2015 WL 4770059, at *3 n.3 (S.D. Ga. Aug. 12, 2015) (citation omitted), adopted by 2015 WL 5168508, at *1 (S.D. Ga. Sept. 2, 2015).

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A); <u>see also</u> <u>Jones v. Comm'r of Soc. Sec.</u>, 478 F. App'x 610, 611 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted); <u>Majkut v. Comm'r of Soc. Sec.</u>, 394 F. App'x 660, 662 (11th Cir. 2010) (per curiam) (unpublished) (citations omitted).[7]  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)-(3); <u>D'Andrea v. Comm'r of Soc. Sec. Admin.</u>, 389 F. App'x 944, 946 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted).

---

[7] "The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for [supplemental security income ('SSI')]," and the "legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a 'period of disability,' or to recover SSI."  <u>Bailey v. Astrue</u>, 739 F. Supp. 2d 1365, 1367 n.2 (N.D. Ga. 2010) (citation omitted); <u>see also</u> <u>Duthie v. Astrue</u>, Civil Action No. 11–0291–N, 2012 WL 2505920, at *2 (S.D. Ala. June 28, 2012) (citation omitted). Thus, "to the extent the Court cites to SSI cases, statutes, or [R]egulations, they are equally applicable to [claimant's] DIB claims."  <u>Bailey</u>, 739 F. Supp. 2d at 1367 n.2.

"The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner." Gibson v. Astrue, Civil Action File No. 1:09-CV-677-AJB, 2010 WL 3655857, at *7 (N.D. Ga. Sept. 13, 2010). "The claimant bears the primary burden of establishing the existence of a 'disability' and therefore entitlement to disability benefits." Id. (citing 20 C.F.R. § 404.1512(a)); see also Symonds v. Astrue, 448 F. App'x 10, 11 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted). The Commissioner utilizes a five-step sequential analysis to determine whether the claimant has met the burden of proving disability. Tisdale v. Soc. Sec. Admin., Comm'r, 806 F. App'x 704, 706 (11th Cir. 2020) (per curiam) (unpublished) (citations omitted); Manzo v. Comm'r of Soc. Sec., 408 F. App'x 265, 266 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted); Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citations omitted); 20 C.F.R. § 404.1520(a)(4).

The claimant must prove at step one that she is not undertaking substantial gainful activity. See Manzo, 408 F. App'x at 266 (citations omitted); 20 C.F.R. § 404.1520(a)(4)(i). At step two, the claimant must prove that she is suffering from a severe impairment or combination of impairments which significantly limits her ability to perform basic work-related activities. See Manzo, 408 F. App'x at 266 (citations omitted); 20 C.F.R. § 404.1520(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing

of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. See Salazar v. Comm'r of Soc. Sec., 372 F. App'x 64, 66 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted); 20 C.F.R. § 404.1520(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, she must prove that the impairment prevents performance of past relevant work. See D'Andrea, 389 F. App'x at 945 (citation omitted); 20 C.F.R. § 404.1520(a)(4)(iv).[8] At step five, the Regulations direct the Commissioner to consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. See Manzo, 408 F. App'x at 267 (citations omitted); 20 C.F.R. § 404.1520(a)(4)(v).[9] "The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to

---

[8] "A claimant's RFC is assessed between steps three and four of the sequential analysis, and is a determination of . . . her remaining ability to engage in work despite impairments." White v. Comm'r of Soc. Sec., CASE NO. 3:18-CV-61-MSH, 2018 WL 6683004, at *3 (M.D. Ga. Dec. 19, 2018). "It is the most that a claimant can do despite being impaired." Id. (citation omitted).

[9] As explained by Doughty, the temporary shifting of the burden at step five to the Commissioner is a creature of judicial gloss on the Act and not mandated by the statutes. 245 F.3d at 1278 n.2 (citations omitted); see also Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995) (per curiam) (citation omitted) ("Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the [Commissioner] to show other work the claimant can do."). "Until step five is reached, the burden is on the claimant to introduce evidence in support of her application for benefits." Salazar, 372 F. App'x at 66 (citation omitted).

perform." Holmes v. Astrue, Civil Action File No. 1:09–CV–01523–AJB, 2010 WL 2196600, at *12 (N.D. Ga. May 27, 2010).  In order to be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. Doughty, 245 F.3d at 1278 n.2 (citation omitted).

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  See 20 C.F.R. § 404.1520(a)(4).  Despite the shifting of burdens at step five, the overall burden rests upon the claimant to prove that she is unable to engage in any substantial gainful activity that exists in the national economy.  Doughty, 245 F.3d at 1278 & n.2 (citations omitted).

### III.  SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of Social Security benefits by the Commissioner is limited.  Lynch v. Astrue, 358 F. App'x 83, 86 (11th Cir. 2009) (per curiam) (unpublished) (citation omitted); see also Jasmatie R. v. Saul, CIVIL ACTION FILE NO. 1:19-cv-03541-AJB, 2020 WL 5406172, at *3 (N.D. Ga. Sept. 9, 2020).  "Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues."  Russell v. Astrue, 742 F. Supp. 2d 1355, 1367 (N.D. Ga. 2010) (citing Fields v. Harris, 498 F. Supp. 478, 488 (N.D. Ga. 1980)); see

also Sherna S. R. v. Saul, CIVIL ACTION FILE No. 1:18-cv-05893-AJB, 2020 WL 1698821, at *3 (N.D. Ga. Apr. 7, 2020) (citations omitted). "This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner." Russell, 742 F. Supp. 2d at 1367; see also Garrett v. Comm'r, Soc. Sec. Admin., No. 21-11749, 2022 WL 3226308, at *3 (11th Cir. Aug. 10, 2022) (per curiam) (citation omitted); Pinckney v. Comm'r of Soc. Sec., 853 F. App'x 347, 349 (11th Cir. 2021) (per curiam) (unpublished) (citation omitted); Loveless v. Comm'r, Soc. Sec. Admin., 678 F. App'x 866, 868 (11th Cir. 2017) (per curiam) (unpublished) (citation omitted); Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam) (citation omitted). If supported by substantial evidence and proper legal standards were applied, the findings of the Commissioner are conclusive. See Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (per curiam) (quoting 42 U.S.C. § 405(g)); Foote, 67 F.3d at 1560 (citation omitted).

"The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding," and "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (last alteration in original) (citations omitted). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary

sufficiency is not high." <u>Id.</u>; <u>see also</u> <u>Peterson v. Comm'r of Soc. Sec.</u>, No. 21-10086, 2021 WL 3163662, at *1 (11th Cir. July 27, 2021) (per curiam) (unpublished) (citation omitted).   "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Somogy v. Comm'r of Soc. Sec.</u>, 366 F. App'x 56, 62 (11th Cir. 2010) (per curiam) (unpublished) (citations and internal marks omitted); <u>see also</u> <u>Thomas-Joseph v. Comm'r of Soc. Sec.</u>, No. 21-11020, 2022 WL 1769134, at *1 (11th Cir. June 1, 2022) (per curiam) (citation omitted); <u>Alvarez v. Comm'r of Soc. Sec.</u>, 848 F. App'x 823, 824 (11th Cir. 2021) (per curiam) (unpublished) (citation omitted).   In considering the evidence in the record, this Court must consider the record as a whole.  <u>Lynch</u>, 358 F. App'x at 86 (citations omitted).  It may not affirm the Commissioner's decision by referring only to those parts of the record which support the same conclusion.  <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983) (per curiam); <u>see also</u> <u>John A. v. Comm'r, Soc. Sec. Admin.</u>, CIVIL ACTION FILE NO. 3:17-cv-00141-RGV, 2019 WL 994970, at *13 (N.D. Ga. Feb. 19, 2019) (citation omitted).  That is, "the Commissioner's findings of fact must be grounded in the entire record; a decision that focuses on one aspect of the evidence and disregards other contrary evidence is not based upon substantial evidence." <u>Wooten v. Astrue</u>, No. CV 309-023, 2010 WL 2521047, at *2 (S.D. Ga. May 26, 2010) (citation omitted), adopted by 2010 WL 2521045, at *1 (S.D. Ga. June 21, 2010).

"The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

However, if the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the evidence preponderates against the Commissioner's decision.  Dyer, 395 F.3d at 1210 (citation omitted); Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam) (citation omitted); Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam) (citation omitted); Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996) (per curiam) (citation omitted).  "In contrast, review of the ALJ's application of legal principles is plenary."  Bailey, 739 F. Supp. 2d at 1376 (citing Foote, 67 F.3d at 1558; Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam)).  Furthermore, "an error is harmless if it does not affect the ALJ's ultimate decision." Loveless, 678 F. App'x at 868 (citation omitted).

## IV.  ANALYSIS OF CASE

Claimant first asserts that the ALJ's decision is not supported by substantial evidence and should be reversed because the ALJ erred in finding that claimant would be off task up to 10 percent of the workday without supplying any "rationale whatsoever as to how she came to the conclusion that [claimant] would be off task up to, but not more than 10% of the time."  [Doc. 13 at 10-11].  Claimant

also argues that remand is required because the ALJ failed to properly evaluate the opinions offered by Dr. Irons in determining that they were only "partially persuasive." [Id. at 11-15]; see also (Tr. at 22-23). In response, the Commissioner contends that substantial evidence supports the ALJ's finding that claimant would not be off task more than 10 percent of the workday, and that the ALJ properly evaluated Dr. Irons' opinions in accordance with the applicable Regulations and that remand on these grounds is not warranted. [Doc. 14 at 5-15]. For the reasons that follow, the Court agrees with the Commissioner.

A.   **Off-Task Limitation**

Claimant contends that the ALJ's "decision is not supported by substantial evidence," since the ALJ failed to "build an accurate and logical bridge from the evidence to [her] conclusion" in formulating the RFC by providing "no rationale whatsoever as to how she came to the conclusion that [claimant] would be off task up to, but not more than 10% of the time." [Doc. 13 at 11 (citation and internal marks omitted)]. According to the claimant, "[a]n explanation of how the percentage of time off-task was calculated [was] significant, since a relatively small increase could preclude competitive employment." [Id. (citation and internal marks omitted)].

"A claimant's RFC is her ability to do physical and mental work activities on a sustained basis despite her limitations from her impairments." Wilver v.

13

<u>Astrue</u>, No. 8:07-CV-488-T-EAJ, 2008 WL 2824815, at *4 (M.D. Fla. July 21, 2008) (citation omitted); <u>see also</u> <u>Land v. Comm'r of Soc. Sec.</u>, 494 F. App'x 47, 49 (11th Cir. 2012) (per curiam) (unpublished).  "In making an RFC determination, the ALJ must consider the medical evidence as well as other evidence in the record." <u>Wilver</u>, 2008 WL 2824815, at *4 (citation omitted); <u>see also</u> <u>Pettus v. Astrue</u>, 226 F. App'x 946, 949 (11th Cir. 2007) (per curiam) (unpublished) (citations and internal marks omitted) ("[RFC] determinations are made based on all of the relevant medical and other evidence."); 20 C.F.R. § 416.927(c) (stating that the Commissioner is obligated to evaluate all medical opinions submitted on behalf of the claimant in regard to her claims for benefits).

In her June 17, 2020, decision, the ALJ found claimant's cervical degenerative disc disease (status post-surgery), cervical radiculopathy, fibromyalgia, osteoporosis, and bilateral hearing loss/tinnitus to be severe impairments, and her depression and anxiety to be non-severe impairments, and she concluded that claimant had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b),[10] except that she required "lifting /carrying twenty pounds

---

[10] Light work is defined as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and requiring "a good deal of walking or standing, or . . . involv[ing] sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday," and "[s]itting may

occasionally and ten pounds frequently"; "stand[ing]/walk[ing] six hours and sit[ting] up to six hours in an eight-hour workday with normal breaks"; "push[ing]/pull[ing] with the upper extremities bilaterally occasionally"; operating "foot controls with the lower extremities bilaterally and occasionally"; "never climb[ing] ladders, ropes, or scaffolds"; "occasionally climb[ing] ramps and stairs"; "occasionally stoop[ing], kneel[ing], crouch[ing], crawl[ing], or balance[ing]"; handling and fingering "bilaterally frequently"; reaching "overhead bilaterally occasionally"; "avoid[ing] concentrated exposure to extreme vibrations, such as working on a vibrating surface"; avoiding "concentrated exposure to unprotected heights and hazardous machinery"; "no more than moderate office noise"; and would "be off task up to ten percent daily." (Tr. at 17-18, 20 (emphasis  and citation omitted)).  In reaching this conclusion, the ALJ discussed claimant's testimony at the administrative hearing, her adult function report, the medical records, and the medical opinions of record.  (Tr. at 18-26).

---

occur intermittently during the remaining time," but "[r]elatively few unskilled light jobs are performed in a seated position."  Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5-6 (S.S.A. Jan. 1, 1983); see also Brewer v. Astrue, No. 8:09-CV-132-T-27TGW, 2010 WL 454916, at *1 n.1 (M.D. Fla. Feb. 9, 2010) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 n.9 (1990); 20 C.F.R. § 402.35(b)(1)) (explaining that SSRs are "'binding on all components of the [SSA]'" and "[a]lthough SSRs do not have the force of law, they are entitled to deference if consistent with the . . . Act and [R]egulations").

In particular, the ALJ first discussed that claimant's mental impairments of depression and anxiety "did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore non-severe."  (Tr. at 17-18).  She summarized that claimant's primary care physician had prescribed claimant Wellbutrin and Xanax, though Xanax was eventually replaced with clonazepam and Abilify was added; that claimant was never referred to a mental health professional; that "[o]bservations of mental status were typically unremarkable, such as findings that the claimant was alert, oriented, and cooperative, with intact cognitive function"; and that her "array of activities, from using the computer for several functions, driving to monitoring her child with a disability and managing her home, indicate[d that] the claimant [was] very capable."[11]  (Tr. at 18 (citation omitted)).  The ALJ also discussed that John Gam,

---

[11] Indeed, the medical record shows that from April 2010 through January 2020, claimant was repeatedly observed as oriented, alert, cooperative, with normal mood and affect, as well as normal concentration and intelligence, with good insight, and with intact immediate, recent, and remote memory and judgment. (Tr. at 321, 325, 328, 332, 372-73, 377, 381, 385, 389, 393, 397, 401, 405, 409, 413, 420, 424, 428, 476, 480, 484, 488, 492, 496, 500, 504, 508, 512, 516, 520, 584, 595, 598, 602, 610, 616, 623, 639, 645, 651, 695, 699-700, 712, 724, 735, 742, 772, 856, 865, 875, 892, 922, 1060, 1080, 1153, 1159, 1199).  The record also demonstrates that claimant was the primary caretaker for her brother who had cancer before he passed away in September 2017, that she was also her husband's caregiver after he had recently had a back injury in October 2017, and that she was the caregiver for her adult disabled son.  (Tr. at 613, 618, 758-59).  Although the relevant period in this case does not begin until January 1, 2015, claimant's alleged amended onset date, see, e.g., (Tr. at 41-43); Casiano v. Comm'r of Soc. Sec., Case No: 6:19-cv-1301-Orl-EJK,

Ph.D. ("Dr. Gam"), performed a psychological consultative disability examination

of claimant in April 2018, which the ALJ summarized as follows:

> After a clinical interview and mental status examination, the claimant was assessed to have anxiety/depression. The claimant had constriction of interests and restriction of activities, but her personal hygiene and grooming were adequate. She did not appear to be antagonistic or suspicious. Her social skills were adequate. There were no indications of malingering. The claimant reported having anxiety and depression; which appeared to be well controlled with medications. They were not considered as significant contributory factor[s]. The validity of her claim of disability had to be contingent primarily on the extent of physical disability as determined by a medical examiner. Currently, from a mental standpoint, the claimant had no impairment in her ability to comprehend, carry out, and remember simple instructions. She had no impairment in her ability to comprehend, carry out, and remember complex instructions. She has no impairment in her ability to respond appropriately to supervision, coworkers, and work pressures in a work setting. She had no impairment in her ability to make simple work decisions. She had no impairment in her ability to make complex work decisions. She had mild impairment in her ability to maintain concentration and pace for more than two hours. She had mild impairment in her ability to adapt to change at work. She had no impairment in her ability to manage her activities of daily living. She had no impairment in her ability to function socially. The opinion is the most thorough evaluation of mental functioning of record and it is consistent with its own findings and supported by the rest of the record, such as absence of significant social issues. Accordingly, it is persuasive.

---

2020 WL 5512111, at *3 (M.D. Fla. Sept. 14, 2020) (citations omitted) (noting that the relevant period for a DIB claim is the period between a claimant's alleged onset date and date last insured), the Court mentions some of the earlier medical evidence to provide context and details about the origin and history of claimant's alleged impairments.

(Id. (internal citation omitted)); see also (Tr. at 758-61).

The ALJ next considered the four broad functional areas and found that claimant had no limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself.  (Tr. at 18-19).[12]  In reaching these conclusions, the ALJ considered, among other things, that claimant's treatment notes showed that she had normal memory, that her memory was grossly intact,

---

[12] "On September 26, 2016, the [SSA] revised the medical criteria for evaluating mental disorders, which revised the pertinent Listings in this case," and "[t]he new Listings were to be applied to all new and pending Social Security cases as of January 17, 2017," and therefore apply in this case.  Hudson v. Saul, CV 118-065, 2019 WL 3938448, at *3 (S.D. Ga. Aug. 20, 2019) (citation omitted), adopted by 2019 WL 4386380, at *1 (S.D. Ga. Sept. 12, 2019).  The Listing of Impairments consists of three sets of "criteria"– "the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain [L]istings)."  See Fenker v. Astrue, Cause No. 1:08-CV-231-TS, 2010 WL 406061, at *3 n.1 (N.D. Ind. Jan. 25, 2010).  "The paragraph A criteria substantiate medically the presence of a particular mental disorder."  Id.  "The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to perform substantial gainful activity."  Id. (citations omitted); see also 20 C.F.R. §§ 404.1520(a)(4)(ii), (iii), (c), (d), and 404.1520a(d)(1), (2).  There are four broad areas in which the SSA rates the degree of functional limitation: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  20 C.F.R. § 404.1520a(c)(3); see also Gwendolyn R. v. Saul, CIVIL ACTION NO. 1:18-CV-2046-LTW, 2019 WL 4744825, at *4 (N.D. Ga. Sept. 30, 2019) (citation omitted).  The SSA rates the degree of limitation in these functional areas using a five-point scale: none, mild, moderate, marked, and extreme, and the "last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."  20 C.F.R. § 404.1520a(c)(4).

and that she was cooperative, alert, and oriented; that she had no problems comprehending, carrying out, and remembering simple and complex instructions; that she reported having no difficulty in understanding and following instructions; that she kept up with others by telephone and computer; that she was able to tolerate others in stores and at her son's volleyball games; that she enjoyed reading, doing arts and crafts, refinishing antique furniture, photography, using the computer, and watching television; that she cared for her disabled son; that her husband observed no problems with claimant's concentration; and that she was able to clean the house, cook, do laundry, drive, and garden. (Id. (citations omitted)). The ALJ acknowledged that the "limitations identified in the 'paragraph B' criteria [were] not a[n] [RFC] assessment but [were] used to rate the severity of mental impairments at steps 2 and 3" and that the mental RFC "used at steps 4 and 5 of the sequential evaluation process require[d] a more detailed assessment," (Tr. at 19), and after concluding that claimant's mental impairments were non-severe at step two, the ALJ proceeded to discuss claimant's testimony, the medical record, medical opinions, and the resulting limitations as a result of her severe and non-severe impairments in her RFC assessment of claimant, (Tr. at 20-26).

In addressing the evidence of record, the ALJ discussed claimant's testimony at the administrative hearing, including that she last worked in 2014

and was fired from her job due to "making a lot of errors"; that her job required
multi-tasking and she had problems with focus and memory due to pain; that pain
in her neck, back, and arm had progressed; that she was also having pain in her
hip joint and shoulders and that she had intense therapy for a frozen left shoulder;
that her pain was usually rated at a four on a ten-point scale in the morning, but
was at a seven or worse by the end of the day; that her hearing loss had progressed
over the years as well; that she had swelling in her legs and high blood pressure;
that sleep problems caused fatigue, mental fogginess, and difficulty concentrating
and focusing; that she could not walk for longer than twenty to thirty minutes;
that while sitting and watching television, she alternated between heat and ice for
pain relief; that any movement, including sitting at a desk to use a keyboard or
raising her arm, caused pain in her neck; that the longest she could use a computer
mouse was about ten minutes; and that she had difficulty communicating with
people as it was hard to catch most of the conversation due to her hearing loss.
(Tr. at 21); see also (Tr. at 44-51, 54-59).  The ALJ also briefly discussed claimant's
medical records that pre-dated her alleged amended onset date, see (Tr. at 21
(citations omitted)), and she then summarized the post-amended onset date record
as follows:

> After the alleged onset date, the claimant continued to be treated by a
> pain specialist with Norco for pain, and the claimant was also noted
> to use heat and ice.  Pain injections were administered from time to

time.    Diagnoses were cervicalgia, cervical radiculopathy, and spondylosis.  In January 2015, the claimant reported pain at a level of three to four on a ten-point scale.  Current medication was noted to be Klonopin, lisinopril, Norco, and Valium.

There were some trigger point injections and occasional epidural steroid injections.  In July 2016, the claimant was trying to find a job that would accommodate her limitations due to pain and fifty percent hearing loss in the left ear.  In November 2016, the claimant was planning to move during a weekend.  Through 2017, the claimant also went to her primary care physician to be followed for hypertension and she received Xanax for reported panic attacks and anxiety, and Wellbutrin was also a prescription.

In 2017, the claimant went to a new pain management doctor due to a change in insurance.  The claimant reported that medication was helpful and she denied side effects, as she was prescribed Baclofen and hydrocodone-acetaminophen.  At times, she mentioned hip and shoulder pain.  In April 2017, the claimant reported an increase in pain after a motor vehicle accident, and she had a tenotomy, improving the degree of pain from six to three on a ten-point scale. She typically reported activities of daily living within normal limits. Sometimes, different joints were painful or different ranges of motion were limited.  A magnetic resonance imaging study of the lumbar spine showed mild disc desiccation, mild hypertrophy, subtle anterolisthesis, and no central canal stenosis.

A November magnetic resonance imaging study of the cervical spine reflected some spondylotic disc disease at multiple levels with mild central canal stenosis and moderate neuroforaminal stenosis at specific levels.  In March 2018, the claimant reported a pain level of four on a ten-point scale, interfering with activities of daily living, and physical examination showed tenderness to palpation in the cervical and lumbar spine with full strength and sensation.

. . . .

In April 2018, the claimant went to her primary care physician to mention six months of intermittent left shoulder pain.  The claimant reported trigger point injections in her neck and back every three months from the pain specialist.  Raising the left arm was limited to

ninety degrees, and the claimant was advised to have no heavy lifting or straining with the left shoulder.  In May 2018, the claimant returned to R. Charles Brownlow, M.D. [("Dr. Brownlow")] of Georgia Pain and Spine Care for pain of an intensity of three on a ten-point scale in her right lower back and right neck.  Medication was refilled because it was beneficial in reducing pain.  The claimant was seen by physical therapy for adhesive capsulitis.  The claimant underwent an audiology consultative examination, which revealed that the claimant's audiogram demonstrated a moderate to severe sensorineural hearing loss.  This [was] equal in both ears.  It start[ed] at about 60 dB in both ears.  She had 92 percent discrimination on the right and 86 percent on the left.  She was continuing amplification.

In June 2018, the claimant's primary care physician noted that the hypertension was controlled by medication, and medication was being taken appropriately and without side effects.  The claimant reported more than fifty percent relief from a neck epidural steroid injection, and it was repeated.  Due to the adhesive capsulitis or frozen left shoulder, the claimant underwent a series of physical therapy session from June through August 2018.  The range of motion of the left arm increased from 115 degre[]es to 163 degrees, and the claimant could reach overhead with pain.  Further physical therapy was recommended.

Dr. Brownlow and his associates continued to prescribe Norco, Baclofen, and diclofenac gel for neck and back pain, as well as trigger point injections and epidural steroid injections.  With the claimant reporting muscle pain, the diagnosis of fibromyalgia was added through December 2018.  In early 2019, the claimant experienced leg swelling.  Doppler studies were normal, and the claimant was prescribed compression hose.  The claimant's left hearing aid was addressed to deal with random power surges and some difficulty hearing a voice.  Her hearing difficulties were mostly meliorated by instrumentation, reprogramming of the hearing aid would be considered.  An x-ray study of the thoracic spine revealed osteopenia.

In August 2019, a cervical epidural steroid injection was administered.  The claimant's most prominent diagnoses at Alliance Spine and Pain Center were cervical radiculopathy and chronic pain

syndrome.  Lumbar spondylosis was also mentioned, as the claimant continued to receive pain injections through 2019.  Straight leg raising test remained negative and gait was normal.  The claimant was continued on medication for hypertension, and treated for an episode of sinusitis in late 2019.  The claimant was started on Fosamax for age-related osteoporosis.  In January 2020, the claimant had tenderness to palpation at the sacroiliac joint on the right and range of motion was painful but not reported to be limited.  She continued treatment for lumbar spondylitis and sacroiliitis.

(Tr. at 22-23 (citations omitted)); see also (Tr. at 391-94, 426-29, 450-53, 570-73, 582-85, 589-626, 633-41, 665-73, 692-701, 763-64, 769-81, 785-88, 805-17, 839-44, 854-59, 872-78, 917-20, 1051-1124, 1138, 1141-42, 1151-56, 1168-77, 1185-1196, 1205, 1222-24, 1233-38, 1247-49).

With respect to the opinion evidence, the ALJ thoroughly discussed Dr. Irons' April 2018 consultative examination, including that claimant would likely have difficulty performing push, pull, grasp, and fine dexterity movements with the right hand due to her neck impairments, finding it partially persuasive, (Tr. at 22-23 (citation omitted)), and she also considered the state agency medical consultants' opinions, see (Tr. at 25).[13]  Following this discussion, the ALJ explained her RFC assessment in pertinent part as follows:

---

[13] On April 17, 2018, Steven D. Dobbs, Ph.D., a non-examining state agency psychological consultant, completed a Psychiatric Review Technique ("PRT") of claimant and concluded that claimant had no limitations in her ability to understand, remember or apply information, or in interacting with others and that she had mild limitations in her ability to concentrate, persist, or maintain pace and to adapt or manage oneself.  (Tr. at 84-85).  On June 5, 2018, Robert H. Heilpern,

The medical evidence of record summarized above establishes that the claimant has degenerative disc disease and spondylosis, confirmed by radiographic imaging.   There is also cervical radiculopathy, left shoulder tightness, fibromyalgia, and osteoporosis.   These impairments can directly affect the claimant's ability to perform work-related functions, such as standing and walking.   The record shows the claimant to have hypertension and hearing loss or tinnitus, which can decrease the claimant's stamina and reduce the ability to engage in those same work-related functions.

---

M.D., a non-examining state agency medical consultant, completed a physical RFC assessment of claimant and concluded that claimant could lift or carry 20 pounds occasionally and 10 pounds frequently; could stand or walk for about 6 hours in an 8-hour workday; could sit for a total of 6 hours in an 8-hour workday; was unlimited in her ability to push and pull, except as shown for lifting and carrying; could occasionally balance, stoop, kneel, crouch crawl, and climb ramps or stairs, but could never climb ladders, ropes, or scaffolds; that she was limited to frequent feeling with her right upper extremity; that she would have difficulty hearing in a manufacturing plant and in heavy traffic; and that she should avoid concentrated exposure to extreme cold, heat, wetness, humidity, noise, vibration, and fumes, odors, dusts, gases, and poor ventilation, as well as all exposure to hazards.  (Tr. at 87-90).  On October 2, 2018, Robin Kirby, Ph.D., another non-examining state agency psychological consultant, completed a PRT form for claimant and found that she had no limitations in her ability to understand, remember or apply information, or in interacting with others and that she had mild limitations in her ability to concentrate, persist, or maintain pace and to adapt or manage oneself. (Tr. at 105-06).  On October 6, 2018, Antoinette Thaxton-Brooks, M.D., another non-examining state agency medical consultant, completed a physical RFC assessment of claimant and concluded that claimant could lift or carry 20 pounds occasionally and 10 pounds frequently; could stand or walk for about 6 hours in an 8-hour workday; could sit for a total of 6 hours in an 8-hour workday; was unlimited in her ability to push and pull, except as shown for lifting and carrying; could occasionally balance, stoop, kneel, crouch crawl, and climb ramps or stairs, but could never climb ladders, ropes, or scaffolds; that she was limited to occasional overhead reaching with her left upper extremity; that she did not have any visual or communicative limitations; and that she should avoid concentrated exposure to vibration and hazards.  (Tr. at 108-11).

The claimant's impairments affect the ability to perform work-related tasks, but the record demonstrates that the extent of limitation is not as much as the claimant alleges.  Several aspects of the medical evidence of record have been considered, pursuant to [SSR] 16-3p, in order to gauge the consistency of the record with the allegations. First, the impairments themselves are not as serious as suggested. Imaging reveals no more than mild degenerative disc disease or most some moderate neuroforaminal stenosis and mild central canal stenosis in the neck.  Imaging of the lumbar spine reflects no more than mild degenerative disc disease. There is nowhere the nerve compression associated with some of the most severe spinal pain.  The claimant acknowledged to treating physicians that treatment was helpful.  The fibromyalgia is not consistently mentioned and the basis for the diagnosis was not adequately specified as required in [SSR] 12-2p.  There was also osteoporosis in addition to fibromyalgia, but the claimant's overall pain was improved by medication, whatever the source of the pain.  The hypertension was benign and not noted to cause symptoms.  The claimant's hearing loss was ameliorated by her hearing aids.

The claimant's own comments to treating physicians and observations of treating physicians also reflect upon the mildness of the claimant's impairments throughout the relevant period.  In January 2015, the claimant denied pain in the back, shoulder, or leg, and while physical examination revealed decreased neck range of motion, strength was full and sensation was intact.  In March 2016, the claimant continued to complain of neck and arm pain, but she denied fatigue or weakness, and physical examination reflected full strength and sensation but decreased neck range of motion.  In August 2017, the claimant denied fatigue or weakness, and the cervical spine had a full range of motion, sensation was intact, and straight leg raising test was negative, although lumbar flexion and extension was limited by pain.  In May 2018, the claimant had tenderness to palpation in the neck and back muscles and the range of motion of the shoulder was limited by pain, but strength and sensation were intact.  In July 2019, there was pain with neck range of motion, but sensation along the spine was normal, there was treating physician [sic] only at the right sacroiliac joint, and gait was normal.

Musculoskeletal exam was normal in August 2019, with no edema observed in October 2019. I[n] January 2020, gait remained normal.

. . . . The claimant's musculoskeletal was managed with medication and pain injections. The claimant's left shoulder adhesive capsulitis improved with physical therapy. More intensive treatment, such as bracing or surgery, was not necessary. Hypertension was managed with medication.

The claimant's activities provide information about her capacity. The claimant cleaned, cooked, did laundry, shopped, and drove according to a function report. The mild or manageable impairments, the unremarkable observations of treating physicians, the relatively modest course of treatment, and the claimant's activities, indicate that the claimant's [al]legations are not fully consistent with the medical evidence of record.

These same factors show that the claimant is able to engage in tasks at a light level of exertion. The light level of exertion is consistent with the light activities that the claimant performs in her personal life. With the radiculopathy from the neck and the left shoulder problem, the claimant is limited to pushing and pulling to occasionally, can reach overhead occasionally, and handle and finger frequently. With the claimant's osteoarthritis in her neck and back and with the osteoporosis, the claimant must avoid concentrated exposure to extreme vibrations, such as working on a vibrating surface that might exacerbate her conditions.

Possible lightheadedness from fluctuation in blood pressure, due to hypertension and its treatment, results in the [RFC] including a limitation to avoid hazards to which such a symptom would make the claimant vulnerable. Due to the claimant's hearing loss and tinnitus, the [RFC] limits jobs to those with no more than moderate office noise. *With mild mental health impairments and possible distraction from pain, the [RFC] allows for being off task up to ten percent daily.*

(Tr. at 24-25 (emphasis added) (citations omitted)).

Claimant argues that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ failed to provide any "rationale whatsoever as to how she came to the conclusion that [claimant] would be off task up to, but not more than 10% of the time." [Doc. 13 at 11]. Claimant, relying on this Court's recent decision in Tammy C. v. Commissioner of Social Security, Civil Action No. 3:20-cv-00074-RGV, at [Doc. 27] (N.D. Ga. Sept. 30, 2021), asserts that because the VE testified that an off-task limitation greater than 10% would preclude all employment, "[a]n explanation of how the percentage of time off-task was calculated is significant," and that remand is therefore warranted in this case. [Id. at 10-11 (citation and internal marks omitted)]. In response, the Commissioner contends that claimant "cites no evidence related to her ability to stay on task, and thus, has not shown that a ten-percent limitation was insufficient to account for any difficulties she had staying on task," and that "this case is distinguishable from prior decisions of this Court" since the ALJ did, in fact, "create a logical bridge between the evidence and [her] RFC finding" as the "ALJ's decision indicates that [s]he was giving [claimant] the benefit of the doubt by including a limitation to being off task up to ten percent of the workday in the RFC finding." [Doc. 14 at 6 (citation omitted)].

A claimant's RFC is the most she can do despite her limitations. See 20 C.F.R. § 404.1545(a)(1). "The Regulations direct the ALJs to 'consider all evidence

in [the claimant's] case record when [making] a determination or decision whether [the claimant is] disabled.'"  Hamlin v. Astrue, No. 3:07–cv–507–J–TEM, 2008 WL 4371326, at *3 (M.D. Fla. Sept. 19, 2008) (alterations in original) (quoting 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3)).  "To be sure, no medical source in the record stated [claimant] would be off-task a specific percentage of the workday, but the ALJ properly explained [s]he included an off-task limitation to account for [mild mental health impairments and possible distraction from pain]."  Dominique M. v. Comm'r of Soc. Sec., CASE # 20-cv-01247, 2021 WL 3931141, at *4 (W.D.N.Y. Sept. 2, 2021) (citations omitted); (Tr. at 25).  "Here, despite the fact that no physician assessed any specific off-task limitation percentage, the ALJ explained that [s]he included an off-task limitation of [up to 10%] based on evidence in the record," and the ALJ "appropriately weighed the different evidence in concluding that [claimant] would be off task [no more than 10%] of the time during a normal workday."[14]  Holli M. v. Comm'r of Soc. Sec., Case # 1:20-cv-1525-DB, 2022 WL

---

[14] This case is distinguishable from Tammy C. on this basis as that case contained support in the record in the form of opinion evidence that was rejected, suggesting a greater off-task limitation was appropriate than found by the ALJ, yet the ALJ failed to explain why he chose the lesser off-task limitation or how he arrived at the specific percentage he found despite the varying evidence on claimant's ability to stay on task.  See Tammy C., Civil Action No. 3:20-cv-00074-RGV, at [Doc. 27 at 31-41].  "In this case there is no contrary or conflicting evidence," nor does claimant "present any evidence to show that a greater percentage of off-task should be assessed."  James G. v. Comm'r of Soc. Sec., Case # 1:20-cv-1885-DB, 2022 WL 2180158, at *7 (W.D.N.Y. June 16, 2022) (citations omitted).  That is, "[u]nlike many

826981, at *11 (W.D.N.Y. Mar. 18, 2022).  In fact, "the ALJ thoroughly reviewed [claimant's] treatment records," and claimant "has not identified medical evidence sufficient to establish that [s]he had greater limitations than those reflected in the hypothetical put to the VE and included in the RFC."  Colon-Toro v. Berryhill, CIVIL ACTION NO. 17-5001, 2018 WL 6735092, at *10–11 (E.D. Pa. Oct. 30, 2018) (citations omitted), adopted by 2018 WL 6599619, at *2 (E.D. Pa. Dec. 17, 2018).[15]

---

other cases with a similar challenge to a seemingly arbitrary 10% off-task limitation, [claimant] is unable to point to any opinion . . . suggesting a greater discount is appropriate," Johnson v. Saul, Case No. 19-C-856, 2020 WL 1900139, at *12 (E.D. Wis. Apr. 16, 2020) (citation and internal marks omitted).  Thus, claimant's reliance on Tammy C. is misplaced since the claimant in that case pointed to evidence that she would be off-task more than the amount found by the ALJ, whereas here, claimant identifies no evidence suggesting she would be off-task more than 10% of the workday, see Lisa M. v. Comm'r of Soc. Sec., 20-CV-0178MWP, 2021 WL 3513832, at *4 n.4 (W.D.N.Y. Aug. 10, 2021) (citations omitted) (finding remand was not warranted based on claimant's argument that the ALJ failed to explain his determination that she would be off take five percent of the workday and distinguishing claimant's case from other cases cited by claimant, since those cases "involved an off-task or other limitation adopted by the ALJ despite record evidence, particularly a medical opinion, that conflicted with such a limitation or a determination by the ALJ to discount a medical opinion that arguably supported the limitation," but "[b]y contrast, . . . the ALJ's decision [here] suggest[ed] that he fashioned the RFC based upon [the medical] opinion and the incorporation of additional restrictions based upon [claimant's] own testimony").

[15] Although claimant relies on statements she made in her adult function report, as well as at the administrative hearing, and challenges the ALJ's conclusions with regard to certain medical records to argue that she "has proved that she has severe impairments capable of producing pain that would reasonably be expected to have her off task a significant part of the day, even though she did not assert a specific percentage," [Doc. 15 at 1-3 (citations omitted)], her argument is "nothing more than an attempt to reargue the weight of the evidence before the ALJ," but

"While [claimant] might prefer that the ALJ had found a greater off-task limitation, the ALJ's ultimate finding that she would not need to be more than [10]% off task has evidentiary basis in the record[.]" <u>Holli M.</u>, 2022 WL 826981, at *11 (citations omitted).[16]  That is, claimant "can point to no physician who imposed any specific percentage of the work day that she would be unable to work" and therefore, the ALJ "could easily have left this restriction out entirely rather than giving [claimant] a generous limitation of [an up to 10%] off-task limitation." <u>Hall v. Comm'r of Soc. Sec.</u>, Civil Action No. 15-12904, 2016 WL 8115401, at *9 (E.D.

---

"[r]earguing the weight of the evidence is an unavailing tactic on appeal" as it "is not this [C]ourt's role to reweigh the evidence before the ALJ," <u>Kristie G. v. Saul</u>, Case No. 1:19-cv-00141-JCB, 2021 WL 698160, at *4 n.19 (D. Utah Feb. 23, 2021) (citation omitted).

[16] Moreover, "the ALJ did not assign a precise percentage of time [claimant] would remain off-task, instead finding that she would be off task no more than 10% of the time in an 8-hour workday," which means, "[i]n other words, [that] the ALJ found that [claimant's impairments] . . . caused some limitation in her ability to remain on-task but not disabling limitations," and "[t]hat determination coheres with the ALJ's other findings," such that "the Court can trace the path of the ALJ's reasoning for finding [claimant] would remain off-task for up to ten percent of a workday." <u>Woody v. Kijakazi</u>, 1:20CV918, 2022 WL 37025, at *5 (M.D.N.C. Jan. 4, 2022) (emphasis, citations, and internal marks omitted), adopted by 2022 WL 868002, at *1 (M.D.N.C. Mar. 23, 2022).  Furthermore, the ALJ "carefully crafted the RFC so that it does not specifically require the off-task time, but rather, allows such off-task time," and "by incorporating a [10]% off-task limitation into [claimant's] RFC, the ALJ's finding was more restrictive than what is supported by the medical and opinion evidence." <u>James G.</u>, 2022 WL 2180158, at *7–8 (citation omitted); <u>see also</u> (Tr. at 20, 25 ("With mild mental health impairments and possible distraction from pain, the [RFC] allows for being off task up to ten percent daily.").

Mich. July 25, 2016); see also Baker o/b/o Baker v. Berryhill, 1:15-cv-00943-MAT, 2018 WL 1173782, at *2 (W.D.N.Y. Mar. 6, 2018) (emphasis and citations omitted) ("Where an ALJ makes an RFC assessment that is more restrictive than the medical opinions of record, it is generally not a basis for remand.").  "The inclusion of that restriction . . . only inured to [claimant's] benefit as it necessarily reduced the number of jobs available in the national economy which she could perform."  Hall, 2016 WL 8115401, at *9. "Because the ALJ afforded [claimant] the benefit of the doubt by including this limitation, the Court finds there is no ground for remand." Jessica W. v. Comm'r of Soc. Sec., Case # 1:20-cv-1209-DB, 2022 WL 345096, at *5 (W.D.N.Y. Feb. 4, 2022) (citations omitted); see also Brenda S. v. Kijakazi, No. 1:20-cv-01806-TAB-JRS, 2021 WL 3749048, at *3 (S.D. Ind. Aug. 25, 2021) (citations omitted) (finding that "even if the ALJ erred in not providing an explanation for determining [claimant] would only be off task 10 percent of the workday, this error [did] not require remand, because [claimant] ha[d] not shown any resulting harm," since she did "not cite any evidence that the ALJ allegedly overlooked or failed to consider that would support finding that she needed to be off task more than 10 percent of the time" or "cite to any medical source opining that she would be off task a particular percentage of the workday, and she did not testify with specificity on her need to take breaks" and therefore, claimant failed "to explain

how she was harmed by the ALJ's finding that she could be off task 10 percent of the workday over and above normally scheduled breaks").

## B. <u>Evaluation of Dr. Irons' Opinions</u>

Claimant also argues that the ALJ's "decision is based upon multiple errors of law in the evaluation of the opinion evidence from consultative physician [Dr. Irons]." [Doc. 13 at 11 (emphasis omitted)]. The Commissioner responds that claimant's "challenges [to] each of the ALJ's reasons for finding Dr. Irons' opinion partially persuasive . . . fail to establish a basis for remand." [Doc. 14 at 12 (citation omitted)]. For the reasons that follow, the Court agrees with the Commissioner.

"Prior to March 27, 2017, the Commissioner's [R]egulations required the ALJ to give a treating physician's opinion substantial weight" and failure to do so "required the ALJ to show good cause," while also requiring "that the opinions of examining physicians be given more weight than non-examining physicians, the opinions of treating physicians be given more weight than non-treating physicians, and the opinions of specialists (on issues within their expertise) be given more weight than non-specialists," but "[p]ursuant to the revised [R]egulations, applicable to claims filed after March 27, 2017," such as here, "an ALJ need not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources," <u>Spikes v. Kijakazi</u>, CV

320-036, 2021 WL 4318314, at *4-5 (S.D. Ga. Sept. 1, 2021) (last alteration in original) (citations and internal marks omitted), adopted by 2021 WL 4317993, at *1 (S.D. Ga. Sept. 22, 2021), and need not "explain why good cause exists to disregard the treating source's opinion," <u>Matos v. Comm'r of Soc. Sec.</u>, No. 21-11764, 2022 WL 97144, at *4 (11th Cir. Jan. 10, 2022) (per curiam).  "Elimination of the treating source rule is intended to eliminate confusion about a hierarchy of medical sources and instead focus adjudication on the evidence, as well as discourage courts from reweighing the evidence in violation of the deferential substantial evidence standard of review."  <u>Spikes</u>, 2021 WL 4318314 at *5 (citation and internal marks omitted).

Under the revised Regulations, the ALJ "must now determine the persuasiveness of medical opinions by considering supportability, consistency, nature and length of the treatment relationship, specialization, and other miscellaneous factors."  <u>Id.</u> (citing 20 C.F.R. §§ 404.1520c(c), 416.920c(c)(1)-(c)(5)). However, because "supportability and consistency are the most important factors, the ALJ must articulate how these factors were considered for a medical source's opinions, but an ALJ is not required to articulate consideration of the remaining factors."  <u>Id.</u> (citations omitted); <u>see also</u> <u>Matos</u>, 2022 WL 97144, at *4 (citation omitted); <u>Rambo v. Comm'r of Soc. Sec.</u>, Case No: 6:20-cv-1527-DCI, 2021 WL 5843106, at *2 (M.D. Fla. Dec. 9, 2021) (citation omitted); <u>Diaz-Ortiz v. Comm'r of</u>

Soc. Sec., Case No.: 2:20-cv-134-MRM, 2021 WL 4205850, at *4, 9 (M.D. Fla. Sept. 16, 2021) (citation omitted); B.M. v. Comm'r of Soc. Sec., Case No: 3:20-CV-94-MSH, 2021 WL 3931939, at *3 (M.D. Ga. Sept. 2, 2021).  In assessing these two factors, the ALJ's "analysis focuses on whether the medical source's opinion is supported by the objective medical evidence and supporting explanations and consistent with the other medical and nonmedical sources in the record." Spikes, 2021 WL 4318314, at *5 (citations omitted); see also A.A.S., 2021 WL 4313603, at *3 (citations omitted) ("Persuasive medical opinions are supported by relevant, objective medical evidence, explained by the source, and consistent with other medical and nonmedical sources.").[17]   Finally, "[c]ourts recognize the new [R]egulations erect a framework that is highly deferential to the Commissioner."

---

[17] Additionally, the ALJ "must only explain whether a source statement is persuasive considering its supportability in, and consistency with, the medical evidence as a whole," and "merely because an [ALJ] finds a source persuasive," does not mean that the ALJ "must accept it wholly and incorporate into [her] RFC assessment any and all limitations that source suggests." K.T.B. v. Comm'r of Soc. Sec., Case No: 3:20-CV-110-MSH, 2021 WL 5906372, at *2 (M.D. Ga. Dec. 14, 2021) (citations omitted).  "To find otherwise, the Court would have to invade the province of the Commissioner and reweigh the evidence which is prohibited on judicial review." Id. (citation omitted).  Furthermore, "the [R]egulations assert that statements on issues reserved to the Commissioner, such as statements that a [claimant] can or cannot work, will constitute evidence that is inherently neither valuable nor persuasive," and the ALJ "is not required to even comment on that evidence in the determination." Rambo, 2021 WL 5843106, at *6 (citations and internal marks omitted); see also Street v. Saul, Case No.: 1:19-cv-1967-CLM, 2020 WL 7401595, at *5 (N.D. Ala. Dec. 17, 2020).

Spikes, 2021 WL 4318314, at *5 (citations omitted); see also Anthony v. Kijakazi,

CV 120-110, 2021 WL 4304725, at *4 (S.D. Ga. Sept. 3, 2021), adopted by 2021 WL

4304721, at *1 (S.D. Ga. Sept. 21, 2021).

On April 3, 2018, Dr. Irons performed a consultative evaluation of claimant,

(Tr. at 749-55), based on her alleged impairments of "spondylosis with

radiculopathy [of the] cervical region, cervical disc displacement, spinal stenosis,

fibromyalgia, [and] sacroiliitis," (Tr. at 749).  Claimant relayed her background

information, including that she lived with her husband and adult disabled child,

required hearing aids that she used 100% of the time, and was independent in her

personal self-care needs, (Tr. at 749-51), and upon physical examination, Dr. Irons

observed that she had "right scapular winging" about her spine, no joint

deformities, and that she was able to perform all functions, though she had

"decreased sensation to pinprick along [the] ulnar and radial sides of [the] forearm

and hand including the fourth and fifth and first digit[s]," (Tr. at 751-52).  Dr. Irons

also completed an All Systems Form for claimant, (Tr. at 754-55), in which he

opined that claimant had decreased left shoulder abduction, (Tr. at 754), and that

she had a "decreased ability to perform push, pull, grasp and fin[e] dexterity

movements with the left hand especially above her shoulder," (Tr. at 755

(emphasis omitted)).

Dr. Irons diagnosed claimant with a history of right cervical radiculopathy with features suggestive of rhomboid paralysis implying C5 involvement, long-term opioid pain management, and prolonged grief reaction with guilt overlay over her brother's death due to colon cancer, and he concluded, in relevant part:

> The claimant retains a normal gait and station. She would likely have difficulty performing push, pull, grasp and fin[e] dexterity movements with the right hand due to cervical radiculopathy involving C5 and C6. This will likely make it difficult for her to maintain a position for key boarding. Her long-term opioid pain management will also be impairing. Based upon today's examination the claimant's prognosis for employment is at most fair. Should she be awarded benefits she can manage the funds.

(Tr. at 753).

In her June 17, 2020, decision, the ALJ specifically discussed Dr. Irons' consultative evaluation of claimant, which she assessed as follows:

> In April 2018, [Dr. Irons] performed a physical consultative examination of the claimant. The claimant complained of joint and muscle pain, weakness, pins and needles, and memory loss. Range of motion throughout was normal, except for a very slight reduction in abduction of the left shoulder. Strength was full throughout. There was a normal gait and station without assistive device, but the claimant had a decreased ability to push, pull, grasp, and fine dexterity movements with the left hand, especially above the shoulder. There was decreased sensation to pinprick along parts of the forearm and hand. The claimant could pick up a coin, walk on heels and toes, and arise from a sitting position. There was no muscle atrophy and straight leg raising test was negative. Diagnoses were history of right cervical radiculopathy, long-term opioid management, and prolonged grief reaction with guilt over the death of her brother. She would likely have difficulty performing push, pull, grasp and fine dexterity movements with the right hand due to

36

cervical radiculopathy involving C5 and C6. This opinion is only partially persuasive because it relates to a particular moment (the neck pain and radiculopathy appear to wax and wane and migrate), and it does not quantify the degree of limitation.

Moreover, he made findings of problems with the left shoulder, but opined limitations in the right shoulder.

(Tr. at 22-23 (internal citation omitted)).

Claimant first argues that the ALJ erred in finding Dr. Irons' opinions only partially persuasive based on her conclusion that his report was internally inconsistent since he made findings of problems with regard to the left shoulder but then found limitations with respect to the right shoulder because "Dr. Irons noted 'right scapular winging'" and "diagnosed cervical radiculopathy on the right, specifically referring to the scapular winging as suggestive of rhomboid paralysis," and therefore, Dr. Irons' "reference to the left hand . . . [was] an obvious error in light of the rest of the doctor's report and diagnoses." [Doc. 13 at 12 (citations omitted)]. Claimant, however, overlooks the fact that Dr. Irons specifically observed decreased abduction of the left shoulder on examination and thereafter opined limitations as to the left hand above claimant's shoulder on the All Systems Form, see (Tr. at 754-55), but then made specific findings with regard to claimant's right hand in his medical assessment, despite the fact that Dr. Irons did not observe any limitation findings with regard to claimant's right upper extremity, see (Tr. at 753-54), and while claimant speculates that Dr. Irons'

reference to the left hand was an "obvious error," [Doc. 13 at 12], it is not so obvious to the Court, especially since, as the Commissioner points out, claimant's "treatment notes from around the time of Dr. Irons' opinion confirm that she was having problems with her left shoulder, not her right," [Doc. 14 at 12 (citation omitted)]; see also (Tr. at 763-67, 785-88, 805-17, 919-20, 1084-90, 1098). "Because Dr. [Irons'] opinions are unsupported by his own examination findings, are internally inconsistent, and are inconsistent with the substantial record evidence, the ALJ did not err in finding Dr. [Irons'] opinions [partially persuasive]." Hebert v. Kijakazi, CIVIL ACTION NO. 20-00405-B, 2021 WL 5865357, at *8 (S.D. Ala. Dec. 2, 2021).

Claimant also contends that the ALJ erred in finding Dr. Irons' opinion only partially persuasive since it related "to a particular moment" and claimant's "neck pain and radiculopathy appear[ed] to wax and wane and migrate," asserting that this reason was "bogus" and pointing out that she had "been receiving treatment for pain in her neck since 2010" and had "been through physical therapy and the treatment with several pain specialists on a continuing basis since at least 2014," with "[e]xams invariably show[ing] limitation of motion and tenderness of her cervical spine, and later of her lumbar spine." [Doc. 13 at 12-13 (citations omitted)]; (Tr. at 22). Although claimant has accurately stated that she has a long history of ongoing treatment for her neck pain, the ALJ's statement that claimant's neck pain

appeared to wax and wane also finds support in the record as claimant repeatedly reported that her symptoms occurred intermittently and that she had good and bad days with regard to her neck pain, with her pain level ranging from zero to seven on a ten-point scale as early as June 2010 and continuing through her testimony at the administrative hearing held in April 2020.  (Tr. at 47, 326-30, 371-77, 395-98, 403-14, 418-21, 430-33, 454-57, 462-73, 478-81, 486-89, 502-05, 514-17, 526-29, 534-37, 550-53, 562-65, 578-85).  And, while claimant also takes issue with the ALJ's statement that Dr. Irons did "not quantify the degree of limitation" as a basis for finding his opinion only partially persuasive, see [Doc. 13 at 13]; (Tr. at 22), and asserts that if "the ALJ was of the opinion that the limitations were not specific enough, she should have sought further information," [Doc. 13 at 13], "[w]here the evidence of record is insufficient and the ALJ cannot determine whether a claimant is disabled, the ALJ may take a number of steps, including recontacting a medical source[ or] requesting additional evidence," but "the mere determination [that] a medical opinion is inconsistent does not require an ALJ recontact the source before discounting that evidence" and an ALJ "is also not required to recontact a medical source where the ALJ has the necessary information to determine claimant's impairments, her [RFC], and her ability to work," Warden v. Saul, CIVIL ACTION NO.: 5:17-cv-168, 2019 WL 4671514, at *11 (S.D. Ga. Aug. 30, 2019) (alteration, citations and internal marks omitted), adopted by 2019 WL 4670771, at *1 (S.D. Ga.

Sept. 24, 2019). Therefore, the ALJ did not have a duty to request clarification from Dr. Irons because his report was vague. See Barbara B. v. Comm'r, Soc. Sec. Admin., CIVIL ACTION NO. 2:19-CV-00083-JCF, 2020 WL 13526607, at *7 (N.D. Ga. Aug. 18, 2020) (citations omitted) (explaining that the Regulations provide that the ALJ may recontact a medical source if there is insufficient evidence to determine whether claimant is disabled and finding that the ALJ was not required to recontact the doctors for clarification of their opinions despite the vagueness of the terms used in their assessments); Ingram v. Berryhill, Case No. 1:17CV2163, 2018 WL 5634345, at *12 (N.D. Ohio Aug. 17, 2018) (citation omitted) (explaining that "an ALJ was not required to contact a consultative examiner when the ALJ found the opinion to be vague and unsupported by the evidence"), adopted by 2019 WL 416331, at *1 (N.D. Ohio Feb. 1, 2019).[18]   Thus, "[b]ecause the ALJ

---

[18] Claimant argues that "[e]ven if Dr. Irons opinion about the limitations of the use of [her] right arm and hand was not specific enough, it clearly showed a medically determinable impairment which could reasonably be expected to result in the limitation of only being able to use a computer and mouse for about 10 or 15 minutes at a time," or at least a limitation of occasional fingering and handling instead of on a frequent basis as determined by the ALJ. [Doc. 13 at 14 (footnote and citation omitted)]. Claimant's interpretation of Dr. Irons' vague limitations, however, does not make it so, and she "is essentially asking this Court to reweigh the record evidence, which is something the Court cannot do." Cain v. Comm'r of Soc. Sec., Case No. 6:20-cv-179-GJK, 2021 WL 2802499, at *3 (M.D. Fla. July 6, 2021) (citations omitted). "An ALJ is entitled to formulate an RFC and resolve any ambiguity or inconsistency in the medical evidence based on the entire record," as "it is the ALJ's responsibility (and not any doctor's) to assess the RFC based on the record as a whole," and the ALJ "can distill a claimant's RFC from an

articulated specific reasons, supported by the record for finding Dr. [Irons']

opinion only partially persuasive, the ALJ did not err." Barber v. Comm'r of Soc.

Sec., Case No: 6:20-cv-1222-LRH, 2021 WL 3857562, at *9 (M.D. Fla. Aug. 30, 2021)

(footnote and citation omitted).

## V.  CONCLUSION

For the reasons stated, the Commissioner's decision denying claimant's

application for DIB is **AFFIRMED**.

**IT IS SO ORDERED**, this 22nd day of September, 2022.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

amalgamation of the record as a whole, without requiring a specific medical
opinion to articulate a specific functional limitation," Coppins v. Saul, CV4:19-188,
2021 WL 1606472, at *2 (S.D. Ga. Feb. 9, 2021) (citations omitted), adopted by 2021
WL 1156628, at *2 (S.D. Ga. Mar. 26, 2021), and here, the ALJ properly assessed
claimant's RFC based on her consideration of claimant's severe and non-severe
impairments and the record as a whole.